162274 Netlist v. SanDisk Sorry about that. Is that okay with you all? You'll figure it out. We'll keep it straight. Particularly with the cross appeal, it's a little confusing. We'll try to do our best. Are you sure you're supposed to be there? Yes. I have to stop and think, but yes, I am supposed to be there. Please proceed. Thank you. Good morning and may it please the court. This case demonstrates the need to protect the due process and procedural rights of patent owners where an IPR petitioner makes new arguments and factual representations regarding the prior art of the patent. For the first time at oral argument. And it also demonstrates the danger of allowing the board to fill in the gaps in the references. And time permitting and subject to your questions, I'd like to address four primary points, two with respect to each reference. And first, with respect to the Average Rouge reference, Netlist was denied its procedural rights because SanDisk failed to tell me disclose its theory that there's a corner case where the address generation unit without transformation or modification. Let me ask you specifics. On page 53 of the blue brief, Netlist argues SanDisk has failed to show an inherent anticipation by Average Rouge. And I'm putting ellipses in here. There's been no showing how Average Rouge's memory interface with its associated address generation unit can necessarily show a corner case. And yet still provide the peculiarities required by the alleged devices. And then you reference your prior argument above that. And I wrote a marginal note there saying this is an interesting and good-looking argument, except I don't see any evidence above that actually supports the position. What's your evidence for that? Well, the position is essentially, Your Honor, that there's no disclosure of a pass-through. And to say that it would have to necessarily be there, they're pointing to the words as needed to essentially mean that it must necessarily pass through. And the language doesn't support it. You'd have to interpret it. It's not must necessarily, it's can necessarily. Can, yes. Very good, Your Honor. You're correct. Can pass through in some corner case. And the evidence doesn't show that at all. And just to highlight that, Average Rouge expressly in paragraph 6 says that the memory may have different bit densities, access speeds, addressing requirements, access protocols and other particularities. That's appendix 1036. Now, how do those particularities relate to Average Rouge? How do those particularities of the memory interface get satisfied? Well, let's look at the words as needed in context, because I think we probably all agree that that's how it should be reviewed. We have a three-tier architecture in Average Rouge. A BIS, which at paragraph 8 of 1036 says that the BIS provides only generalized commands, it's a generic command that communicates with Tier 2, the sequencer. And the Tier 2 sequencer is said to have very limited control and it has specific reference to putting a common clock domain between the sequencer and one or more memory modules. Let me ask you this. Looking at figure 6, is 42, the address generation unit, used to transform or modify address signals from the sequencer at 8A? I believe so. So we have the second tier, the sequencer, which is said to have only limited control of the application and it talks about a common clock domain. And then we have an express teaching for Tier 3, the memory interfaces. You can find that at paragraph 11 of appendix 1036, which says they're designed in accordance with the particular signal interface requirements and physical characteristics of the respective one of the memory modules. So we don't have to speculate that there might be a pass-through. The teaching is you have a generic signal, you have very limited additional control for the sequencer. Primarily it says for common clock domain. And then you have all of this express teaching from paragraph 11 that says the memory interface is where all of the particular requirements for the memory are handled and generated. It's the bottom tier. There's no teaching that the sequencer can have a signal that can pass through in a form that's based on the particular physical characteristics of the memory module. It's not there. I just took you through the context of AverBooz to show why it's not there. But it's also, AverBooz doesn't use the words only if needed. He says as needed. And the context of AverBooz is that there's a transformation, it's made as needed, which is in a way necessary to achieve the goal. Is that transformation at 42? That's the generator. Yes, the 42, if that's the AGU, the address generation unit, yes, that's what the specification teaches. That's where the transformation is, that's where all the particular requirements are handled. Where does it say that? In what paragraph? I took you through the context of as needed, Your Honor, but 42 says that the address generation unit, I'm sorry, the specification teaches that the address generation unit is what generates the address and control signals to be used by the memory devices. And the specification teaches that there are two different generation units, one for addresses and one for data. And that the specification never equates them, and I'll tell you that I wanted to point out, and we did it in our brief, that the board relied upon paragraph 56 of AverBooz, which concerns the data generation unit and not the address generation unit. But AverBooz teaches that it has two distinct units, and they're separate and distinct, and there's no block diagram for the address generation unit, but there is a block diagram for the data generation unit. And you'll see that the block diagram has these XOR gates, which provide the logic for the data generation unit, which is very detailed and specific. But there is no, and that's figure seven, by the way, of AverBooz, but there is no such block diagram for the address generation unit, and it has distinct purposes. It has different inputs, it has different outputs, there's just no basis whatsoever to assume that the address generation unit has the same structure, function, or operation as the data generation unit. There are two distinct blocks, and the board, frankly, completely overlooked that, because they cited the data generation unit as evidence of how the address generation unit operates. Let me take you over to Wayne. With respect to the group B arguments, Netlist accused the PTAB of improperly burden shifting, but the PTAB addressed both parties' arguments and evidence, and disproved unpatentability by preponderance of the evidence. Are you still standing by that burden shifting? Absolutely, Your Honor, and I'll tell you, and I thought we made it clear in our brief, and forgive me if we didn't, but the board only looked at the data writing functionality of the HUANG memory interface, and it ignored, it just ignored the testimony and evidence regarding the reading and shifting functionality of HUANG's transparent interface. It's clear, HUANG is black and white on this. At appendix 1078, the test interface can read each word and then shift the entire word bit by bit for testing, so it has a read operation and a shift operation. We tried to take you through figure four of HUANG, which is the redundant shift operation, and it might be a little bit complicated, but I'll try to revisit that. Figure four of HUANG shows you have a memory A and a memory B, and then you have a four-bit word width in memory A and a six-bit word width in memory B, and those are read into the memory interface. Well, you see the word latch, and while memory B has six bits, they all are read into the memory B interface, but the memory A interface, because it operates on a common control line, has to shift two extra times with redundant bits. So the memory B interface has a read and shift operation that is influenced by the word width and memory B by the operation of the memory interface for memory B. And so the operation of one transparent interface is influenced, i.e. forced to continue shifting by the operation of the other HUANG interface, and you won't find this in the board's decision. We put it in our brief, we cited it out, we argued it, we put the declaration evidence from our Dr. Sechin, who walked through it, and the board, for its part, didn't consider the reading functionality and didn't look to the, I'm sorry, the board only considered the writing functionality and didn't consider the read and shift functionality of the memory interface. And they stopped there, and then they expressly said that Netlist, you haven't shown how the memory interfaces are operable independently. And that was an improper burden shift. So this sounds like opinion writing issues. The board is allowed to reject your arguments by saying they're insufficient without being accused of burden shifting. Well, if they did that, your honor, then they ignored the evidence that directly refutes the position that the conclusion they reached. Pardon me? Well, they disagreed with it. They disagreed, but because they didn't acknowledge it, I can only... They don't have to acknowledge it, though. I mean, if you think that they made an error and their decision lacked substantial evidence because they didn't address this argument specifically, then you argue that. I mean, to argue that they're burden shifting because in one sentence they say they don't agree with your argument is a bit too much. Fair enough, your honor. Then I think, point taken, but it doesn't change the result. The result is that the board didn't consider the evidence and argument that showed that one memory interface is influenced by the operation of another. And so whether you call it a burden shift or you take that language out... Well, you can't say they didn't consider it. They may have just disagreed with you. You can say that they were wrong and that substantial evidence doesn't support their decision, but it's not that they didn't consider it. Okay, then maybe it's best said that the board's decision is not supported by substantial evidence. I mean, this is a big deal, and this is not the first time I've heard arguments that the board is shifting burdens because they use a sentence saying that the patentee has not demonstrated the validity of its argument, but they've otherwise said the petitioner has met its burden. And it's attempting to transform a substantial evidence question into a procedural legal error, and that's improper. You can argue substantial evidence, but taking one sentence out of context when they rejected your argument is not a legal error. Our view was that we couldn't tell that they considered the issue and they didn't rule on it expressly. I'm into my rebuttal time, if I may reserve. May it please the court. Netlist's manufactured procedural argument for the Averbouge grounds is both illusory and irrelevant. Under the uncontested claim construction, there can be little debate that Averbouge's sequencer generates an address and control signal for testing the memory. That's the best address and control signal. Clarify something for me. Netlist argues, at least at page 25 of its brief, but several times, that it was only an oral argument that Sandisk alleged that Averbouge teaches the address could pass through. And in the Redbury, Sandisk responds that we did it at least five separate times and cites to various points in the PTAP proceeding the petition, expert declarations and reply and so on. Saying there are clear notice of the pass through argument. How do the parties have such totally contradicting views? It's almost a black and white thing. I can't speak to why Netlist has such a contradictory view, but the issue as it crystallized post-institution really was whether the operation of Averbouge's address generation unit somehow removed what the sequencer unambiguously does from the scope of the control module, which is simply produce that. As that issue developed over the course of post-institution, and I guess perhaps it's best to just go straight to the record, if you look at the reply, at page, this is at appendix 666. Actually, let me back up, because both the petition and the board's institution decision said that the sequencer, sorry, acknowledged that the operation of the address generation unit operates as needed when it translates what the sequencer has generated, which is a BIS address and control signal. A control signal for testing a memory device. And laid the evidentiary foundation for this dispute over how the address generation unit, what it actually does. And in the reply, and this is at appendix 666, it says, we state up at the top that there's no dispute that the sequencer produces the BIS address control signal. This is the second and third line. And then down below in the next paragraph, we say that the actual addressing information produced by the sequencer and the address generation unit 42, merely applies the received addressing information to a given physical memory configuration of row, column, and column. We cite to Alpert's declaration, where he, again, cites to the as-needed language for the address generation unit. That's at paragraph 49, and that's at appendix 1403. Mr. Wimbiscus? No, right. I'm sorry. Yeah, I knew it was going to get me. So you just demonstrated the importance of the comma in the English language when you read that and you missed the comma. And of course, the comma changed the entire meaning of that paragraph. I'm just pointing that out for grammarians in the audience. Okay. Thank you, Your Honor. And for my clerks. So lest there be any doubt that Netlist understood the argument it was making, if you go to the deposition where they deposed Dr. Albert on this very issue, and this is appendix 2241 through 2243, this is where the actual articulation of as-needed shows up for the first time in the record. It was when they were deposing Dr. Albert. And in response to a series of six or seven questions, maybe more, about what is happening at the address generation unit,  the agency says, well, I was going to say it might not. This is at appendix 2242. It's according to the physical characteristics of the memory module. It's possible that the address and control can just pass straight through, depending on what might be required to map the patterns to the row and column organization. So it's only in response to their questioning on this particular issue that the pass-through comes out. It wasn't a new theory that was sprung upon Netlist, and certainly not at the oral hearing. When it came to the oral hearing, as the petitioner, Sandisk, went first, Netlist goes second, Netlist stood up, and they made a lot of arguments in the oral hearing about, they have new counsel, and they made a new argument on this, and a new argument on that, and a new argument here. They didn't call out this pass-through theory specifically as a new argument when they had the opportunity to do it at the oral hearing, and the board didn't view it as a new argument either. They didn't like the answer, I think, that they got when they deposed Dr. Albert, but this was not a new argument that Sandisk sprung on them right at the end. The issue as it crystallized, for the Averbouche grounds anyway, was the impact of the data generation unit. I want to address the inherent anticipation argument, Judge Wallach, that you raised earlier. There is substantial evidence in the record supporting the board's factual determination on how the address generation unit operates. If we could turn to Averbouche, starting at paragraph 11. Do you have a page for us? I do, that's at appendix 1036. Mr. Wimbiscus cited the paragraph 11, but in the middle of paragraph 11 at 1036, it says, each memory interface receives memory operations from a controlling sequencer and translates as needed, including associated address. In the next sentence, for example, a memory interface may... Wait a minute, you just read that sentence, each memory interface... Where does it say as needed in that sentence? It just translates memory operations including associated address... Oh, you just left out the middle part. Be careful. It sounded like you... That's okay, keep going. That's why when I quote from briefs, I say there's an ellipsis in there. So what I was driving at was the next sentence, where it says, for example, a memory interface may translate addresses supplied by a controlling sequencer, and the memory interface may translate the data. Perhaps the most compelling substantial evidence, and the board cited to this, but reproduced this section in both the institution decision and the final written decision, is if you look at paragraph 48 of Abrevouge, about halfway down that paragraph, it says, when electronic device 2 is operating in the BIST mode, however, the BIST enable signal causes the multiplexers, 45 and 46, to select the BIST address control signals and the test data provided by the respective higher level sequencer. If we look to figure 6, and we see what's happening there, which is at appendix 1030, it says that multiplexer 46 selects the BIST address control signal, and it's the multiplexer 46 that sits right in front of the line going out to the memory. So the multiplexer selects the BIST address control signal. Finally, with respect to the complaint about the data generation, the board relying on the data generation unit, the language as needed appears for both the address generation unit and the data generation unit. The board looked, because the data generation unit provides an actual example of what as needed means, the board turned to that. That's spelled out in paragraph 56 in Abrevouge at 1040, where it says there, and I think there's no dispute, that the data generation unit can pass the data through with no transformation or translation. So that's an example in the specification that the board relied on to show what as needed means. Before your time runs out, can you turn to the Wang issue? It's a little confusing to me. I guess we've been looking at figure four for Wang, and your friend talks about the memory interface. Can you, just using these diagrams, respond to what he said? I assume you disagree with his analysis. Yeah, I think to set the stage for that analysis, and how the board viewed it, it's important to look at the 434 patent first, at the top of column eight. This is at appendix 289, where it says that each data handler is operable independently. This is where the patentee describes what operable independently means. It says, starting at line three of column eight, it says, for example, each data handler is configured to write... Where are you? I'm at appendix 289 at column eight of the 434 patent, where the patentee explains what operable independently is. At column eight, line three, it says, for example, and this is an example of operable independently, it says each data handler is configured to write to and or read from the corresponding plurality of data ports of one or more memory devices without being in communication, presumably with any of the other data handlers, or other data ports of the memory devices. As such, each data handler can be used to generally independently test a portion of the memory space of the memory module. That's the patentee's example of what operable independently means. If we turn back to appendix 1079, where we're looking at Hwang, you can see the figure two right there. There's no indication that any of the individual transparent memory interfaces are communicating with each other. In the second, or actually the first full paragraph on appendix 1089, it explains that, however, for transparent BIS, it is preferred to have the test interface generate test patterns locally. You're at 1079, not 1089? I'm sorry if I said 1089. I'm at 1079. That's describing Hwang's figure two. In the first full paragraph, second sentence, it says, however, for transparent BIS, it is preferred to have the test interface generate test patterns locally to avoid test data routing from test controller to each memory array. We have each transparent memory interface corresponds to a particular memory module, generates the data locally, and there's no evidence in Hwang that they communicate with each other while they are doing that. Another characteristic of operable independently from column eight is that the data handlers are generally modular. Again, at appendix 1079 in figure two, you see the transparent memory interfaces are generally modular. The board really just took the characteristics of operable independently from the top of column eight in the 434 patent and applied that to the Hwang reference and made a determination that they operate independently. I see that I have about a minute left. I know that there is a cross-appeal. I want to make sure I give the panel the opportunity to ask questions with respect to the Hwang reference. I'd be happy to see the remaining of my time. Can send this? OK, just on the cross. Send us argues that even though its petitions were unsupported with respect to Hwang alone, such error was, quote, washed clean by the institution decision and should have been allowed to submit new evidence post institution as part of its replies. Sign me to a case that extends this exception to allowing a petitioner to submit new evidence post institution to supplement a ground raised in its petition. I don't have a case off the top of my head for that. The Administrative Procedures Act, I think, stands for the proposition that if the board is going to submit a case, the petitioner is allowed to support that new ground. I'm quite certain that if there was a case, you'd have it on the top of your head. So, OK, thank you. Thank you, Your Honor. Your Honor, a few quick points. First of all, in response to what counsel just said, the Alpert deposition testimony was never made part of the petition or the reply. The theory was never adopted. There was nothing to move to strike. There was nothing to respond to. We had just heard a lot of testimony that the board of us about whether the data handlers communicate with each other, but that's not the claim construction. Claim construction is without influence or control by another, and I walked you through why one influences the control of another. So turning then to the cross appeal, there is no case that allows counsel to sit back until the reply to bring in evidence for the first time that was necessary to establish a prima facie case. It's not there, and the board basically said as much. We have rules. Our rules are that the petition must have a detailed explanation of the significance of the evidence. Doesn't this depend on the board's conclusion that the ground it instituted on was raised in their petition, that they did raise an alternative? Let me finish. If that's the case, then they don't have an argument because that's the thing they raised in their petition. They should support it then. If the board did raise an entirely new ground for rejection, certainly they're allowed to present evidence to respond to that new ground for rejection. They aren't required to anticipate the board's entirely new ground. A couple points to that, Your Honor. First, the board did make it clear that its decision to review on Hwang alone was based solely on evidence expressly cited by the petitioner in its petition. And it did go on to say that there are procedural safeguards, and this court said in Belden v. Burk-Tech, you have to take advantage of your procedural safeguards, and those include not only moving to referee hearing or moving to withdraw the additional ground that you had to disagree with, but most importantly, moving to provide supplemental information in support of the instituted ground. And the board made it clear, and that's what the rule expressly allows you to do. There's no rule that says I can sit back and wait to my reply, and for good reason, because that would really sandbag and disrupt the whole process. But the rules are clear. Your view is, if they had thought that it was a new ground, they should have taken steps before the reply to get their information out. Absolutely, and that was the reasoning in part from the board. The board said, we have these procedural safeguards. You have the right to put in supplemental evidence. And I thought, one last point, if I may jump to the end, with respect to Hwang and the reference to CERN, there's no explanation of any alleged common knowledge as a basis for CERN or in the petition. So the case they cited about common knowledge doesn't apply. And the reference to a data handler, data handlers are to generate, modify, and transform. But CERN was a data buffer, and a data buffer doesn't generate, modify, or transform. So there was no explanation as to any relevance. You need to tie any alleged significance of the common knowledge, if they allege that it was there, they need to tie it to an adequate explanation. And you can find that in the Ariosa Diagnostics case that they cited in their brief. Thank you, Your Honor. Thank you, Your Honor. On the cross appeal, the rules that the board has implemented, I don't think were intended to cover this situation where the board institutes on a new ground, first of all. Second of all, we didn't disagree with the board. Your argument depends on the fact that this is a new ground. If we agree with the board that this wasn't a new ground, you're done on the cross appeal, right? That's right. I don't think there really can be any dispute that the petition did not raise Hwang Wong, our expert. I think there can be a lot of dispute, the way you worded your petition. But even if it is a new ground, why didn't you ask to supplement the record or the like before your reply? First, I don't think we felt that the record needed to be supplemented, because this trivial implementation is something that... If it didn't need to be supplemented, then why did you try to put in new evidence with your reply? The submission of supplemental information in the rules, the board, in our experience practicing before the board, routinely denies those requests. They're typically granted for instances where a patent owner makes a challenge to whether or not it references a printed publication or something like that. That's typically the scenario where the board allows the submission of supplemental evidence. For these trivial implementation details, it wasn't a matter of putting evidence into the record. It was a matter of arguments. It was a matter of saying that this is a trivial implementation detail. We did not need to rely on CERN. CERN shows this unambiguously. The evidence was sufficient in the record to go forward. We didn't have an issue with the board's institution decision. Thank you. We thank both sides. The case is submitted.